**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **KENNETH GOODSON**, *et al.* ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. WGC-14-324** |
| ) | |
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**MEMORANDUM & ORDER**</u>

A trial was held in this matter on June 24, 2015.  The court entered judgment on the issue

of liability in favor of Plaintiffs Kenneth Goodson and Kimberly James against the United States.

Judgment on the issue of damages was entered by consent in favor of Plaintiff Kimberly James

against the United States in the amount of $2,500.00.  Following testimony and the introduction

of documentary evidence on the issue of Kenneth Goodson's damages, a ruling on that issue was

held in abeyance to permit the court to review Mr. Goodson's medical records.  The court is now

prepared to rule.

Mr. Goodson seeks damages arising from a motor vehicle accident on March 21, 2012 in

the north bound lanes of Route 1 at or near the 9500 block in College Park, Maryland.  Route 1 is

a two lane road in each direction with a turn lane in the middle of the roadway.  Mr. Goodson

was driving a 2000 Hyundai Accent in the north bound lane when he was struck in the left rear

by a U.S. Postal Service ("USPS") tractor trailer.  Mr. Goodson testified that as a result of the

rear impact, his vehicle was spun around and dragged approximately 50 to 100 yards by the

USPS truck.  His vehicle sustained damage to its left rear, both left doors and the left front

fender.  The damages consist of indentations and circular scrapings to the vehicle's sheet metal caused by the USPS truck's lug nuts.

Immediately following the accident Mr. Goodson was transported by his wife to Laurel Regional Hospital where he was seen in the Emergency Room.  He complained of neck, head and back pain.  After examination he was diagnosed with muscular spasm and headache and prescribed Vicodin, Flexeril and Motrin.  Mr. Goodson was provided with directions for treating muscle spasm and headache and discharged with instructions to follow-up with his primary care provider.

On April 9, 2012 Mr. Goodson saw Dr. E. Masoud Pour, M.D., an orthopedic surgeon in Greenbelt, Maryland.  He complained of upper back pain and low back pain which wakes him two to three times in the middle of the night.  Dr. Pour diagnosed Mr. Goodson with acute cervical strain/cervical radiculopathy, acute upper back strain, and acute low back strain/lumbar radiculopathy.  Therapy, electrical stimulation and exercises for his neck, shoulder and back were provided as well as a prescription for Diclofenac.  Mr. Goodson saw Dr. Pour on four additional occasions:  April 11, 12, 19, and 23, 2012.  On each visit Mr. Goodson complained about headache, neck pain, upper back pain, and pain throbbing down the low back.  Dr. Pour referred Mr. Goodson to Community Radiology Associates for imaging studies of his thoracic and lumbar spine.  Both imaging studies returned as normal radiographs.  The treatment regimen with Dr. Pour was unsuccessful and Mr. Goodson believed the therapy made him worse.

Mr. Goodson sought treatment from Dr. Andrew Siekanowicz, M.D., an orthopedic surgeon in Silver Spring, Maryland.  After an initial examination on April 26, 2012, Dr. Siekanowicz diagnosed Mr. Goodson with (a) post-traumatic migraines, (b) insomnia, and (c) cervical and lumbar strain and spasm with left cervical radiculitis.  Dr. Siekanowicz prescribed

Mobic (Meloxicam) and Parafon Forte DSC. He referred Mr. Goodson for physical therapy. Mr. Goodson saw Dr. Siekanowicz on three additional occasions: May 10, 31 and June 28, 2012. During the May 10, 2012 visit Mr. Goodson reported continued symptoms with his cervical (neck) spine and lumbar (back) spine. Because Mr. Goodson reported continued significant insomnia episodes and continued headaches, Dr. Siekanowicz provided Mr. Goodson a neurology referral and a head CT (computed tomography) prescription. Mr. Goodson was directed to continue with physical therapy. By the May 31, 2012 appointment, although Mr. Goodson continued to experience neck and back symptoms, he experienced significant improvement, particularly with pain and the ability to sleep. Mr. Goodson revealed relative improvements of his headaches. Dr. Siekanowicz directed Mr. Goodson to continue with physical therapy. At the June 28, 2012 appointment Mr. Goodson disclosed marked improvement of his orthopedic complaints. He noted the absence of any significant insomnia. Dr. Siekanowicz's examination of Mr. Goodson's cervical and lumbar spine revealed a full range of motion. There were no spasms or tenderness. Based on his orthopedic status Dr. Siekanowicz determined Mr. Goodson was stable for discharge from his care. He advised Mr. Goodson to continue with the home exercise regimen for three months. Dr. Siekanowicz noted Mr. Goodson's ongoing neurological treatment with Dr. Kurlanzink.

At approximately 1:10 a.m. on April 27, 2012 Mr. Goodson arrived at Laurel Regional Hospital where he was seen in the Emergency Room. Mr. Goodson reported receiving an anti-inflammatory shot in the back the previous day by his orthopedist. Since then his back pain had intensified and he was unable to sleep. He described the pain as sharp. Mr. Goodson rated his back pain on a scale of 8 out of 10. He disclosed his back pain began a month ago following a motor vehicle accident. Upon examination the physician was unable to reproduce the back pain

with palpation.  The physician prescribed Carisoprodol (brand: Soma), a muscle relaxant, and Hydrocodone (brand: Vicodin), a narcotic pain medicine, with Acetaminophen.  The physician advised Mr. Goodson to follow-up with his orthopedist in three days for further evaluation and treatment.  He also instructed Mr. Goodson to stretch daily in the morning and at night.

Mr. Goodson had twenty-seven (27) visits with Accessible Physical Therapy Services of Greenbelt, Maryland starting April 30, 2012 and concluding on June 26, 2012.  He was discharged from the program because the goals were met and skilled care was no longer needed.

Pursuant to the May 10, 2012 referral by Dr. Siekanowicz for a neurology evaluation and treatment due to insomnia and recurrent, post-traumatic migraines, Mr. Goodson returned to Community Radiology Associates on May 22, 2012 for CT head without contrast.  The radiologist found no acute intracranial pathology.

Besides physical impairments Mr. Goodson experienced emotional challenges following the motor vehicle accident.  Mr. Goodson sought treatment from the Institute for Life Enrichment ("ILE") of Washington, D.C.  His first appointment was May 25, 2012.  His wife accompanied him.  He was evaluated by Dr. Dunston.  Mr. Goodson reported he was short-tempered and claimed the motor vehicle accident had changed his functioning.  In the clinical assessment Dr. Dunston determined Mr. Goodson functioned normally in 13 out of 15 areas. The two exceptions were Mr. Goodson's affect and mood were sad and Mr. Goodson's preoccupations were classified as "obsessions" due to his continual focus on the motor vehicle accident.  Mr. Goodson told Dr. Dunston that he wanted to stop being angry, get his life back and be happy.  Dr. Dunston diagnosed Mr. Goodson with Adjustment Disorder with Mixed Anxiety and Depressed Mood (Axis I).  The doctor further noted Mr. Goodson has difficulty in interpersonal relationships (Axis IV).

After his initial session with ILE, a report was generated summarizing Mr. Goodson's history and proposing a treatment plan.  The second and fourth paragraphs of this report state:

> In describing his concerns and symptoms, he states he experiences severe migraine headache, irritability, mood swings, anger, short temper, difficulty dealing with family members, coworkers, other drivers and people in general.  Patient also states he experiences "road rage" and panic, and severe anxiety while driving when triggered.  Patient stated that the accident "turned his life upside down" and took away his joys and goals and left lots of negative symptoms and concerns.
>
> *                              *                              *
>
> Mr. Goodson reports that lots of little things trigger him and set him off, and it is difficult for him to move past them and they end up ruining much of his day.  He reported that there is a big strain on his relationship with his wife and children and that he realizes that he has significantly less patience with them and others.  He reports that the accident has disrupted his routines, his sleep habits and has severely impacted what he wants to do and what he used to enjoy doing.

Mr. Goodson had 14 additional sessions with ILE:  June 1, 8, July 13, August 8, 18, 22, 29, September 5, 12, 19, 26, October 3, 10, 17, 2012.

Based on Dr. Siekanowicz's referral, Mr. Goodson saw Arthur Kurlanzik, M.D., a neurologist with the Neurodiagnostic Center of Maryland Orthopedics, P.A. in Laurel, Maryland, on June 4, 2012.  Mr. Goodson complained about migraine headaches, an impairment he had not experienced in almost twenty years.  The migraines were felt on both temples, were intense and were associated with nausea.  Mr. Goodson explained that vomiting consistently got rid of the headaches.  He had taken over-the-counter migraine medicines which helped.  After obtaining Mr. Goodson's medical history, Dr. Kurlanzik physically examined Mr. Goodson.  The exam showed no focal findings.   Dr. Kurlanzik prescribed Prodrin.   During a follow-up neurodiagnostic visit on July 9, 2012 Mr. Goodson reported his headaches were better and found

Prodrin helpful.   Dr. Kurlanzik physically examined Mr. Goodson, noting his head was nontender. Dr. Kurlanzik prescribed Prodrin again.     During the November 19, 2012 neurodiagnostic follow-up visit Mr. Goodson reported his headaches were improved and taking Prodrin was helpful.  Dr. Kurlanzik found Mr. Goodson's head nontender during the physical examination.  Mr. Goodson was given another prescription for Prodrin.  Finally, on January 14, 2013 Mr. Goodson had another neurodiagnostic follow-up visit.   He reported a continued decrease in the frequency of headaches.  Dr. Kurlanzik found Mr. Goodson's head nontender during the physical examination.  Mr. Goodson was given another prescription for Prodrin.

On August 30, 2012 Mr. Goodson saw Atlener Artis-Trower, M.D., of T&T Healthcare, Inc., of College Park, Maryland for an initial psychiatric evaluation.   After obtaining Mr. Goodson's vitals, his medical history, social history, family history, work history and conducting a mental status evaluation, Dr. Artis-Trower diagnosed acute stress disorder, specifically Attention Deficit Hyperactivity Disorder ("ADHD") (Axis I) and migraines since March 2012 as well as increased blood pressure since March 2012 (Axis III).  Dr. Artis-Trower recommended Mr. Goodson continue his therapy with ILE and continue taking Ritalin.   She prescribed Remeron, 15 milligrams, once a day.  At his next appointment, October 5, 2012, Mr. Goodson disclosed unpleasant side effects from taking Remeron notably increased appetite resulting in weight gain.  He wanted to stop taking this medicine.  He continued to be irritable and easily angered.  He further reported having ongoing problems with focusing, sadness and depression. He disclosed increased recurrent nightmares, increased sleep disturbance and increased headaches.  Dr. Artis-Trower discontinued Remeron and prescribed Wellbutrin and Adderall. Dr. Artis-Trower updated Mr. Goodson's current diagnosis as ADHD and post-traumatic stress disorder ("PTSD").

By the next appointment, November 8, 2012, Mr. Goodson reported he was feeling better.  His headaches had decreased, he was sleeping better, he had decreased nightmares and his focus had increased.  He disclosed no side effects from his medication.  Dr. Artis-Trower continued Mr. Goodson on Adderall.  She diagnosed ADHD and PTSD.

At the December 13, 2012 appointment Mr. Goodson reported he was doing well, focusing better at work, making less mistakes.  He denied any side effects from his medication. Dr. Artis-Trower continued Mr. Goodson on Adderall.  She diagnosed Mr. Goodson with ADHD.  At the January 10, 2013 appointment Mr. Goodson reported he was doing better with an Adderall dosage of 10 milligrams versus 5 milligrams (his wife switched her 10 milligram Adderall with his 5 milligram Adderall).  Dr. Artis-Trower updated his Adderall prescription to 10 milligrams.  Her current diagnosis was ADHD and PTSD.  On February 8, 2013 Mr. Goodson again reported doing well with the medication.  He had no side effects.  He felt great and was able to get his work done.  Dr. Artis-Trower continued Mr. Goodson on Adderall and Wellbutrin. Her current diagnosis was ADHD and PTSD.  At the March 8, 2013 appointment Mr. Goodson reported continued benefits from the medication with no side effects.  Dr. Artis-Trower directed Mr. Goodson to continue with the current medication.  Similarly, during the April 5, 2013 visit, Mr. Goodson reported continued benefits from the medication with no side effects.  Dr. Artis-Trower directed Mr. Goodson to continue with the current medication.  She diagnosed ADHD and PTSD.  Mr. Goodson reported continued benefits from his medication at the May 10, 2013 visit.  Dr. Artis-Trower directed Mr. Goodson to continue with the current medication.  She diagnosed ADHD and PTSD.

During the August 22, 2013 visit Mr. Goodson had no complaints.  He took his medicine as prescribed.  He felt the medicine helped him to control his symptoms.  Dr. Artis-Trower

diagnosed Mr. Goodson with ADHD.  During the next seven visits (September 26, October 11, October 31, December 6, 2013, January 10, February 7 and March 7, 2014), Mr. Goodson reported continued benefits from the medication without side effects.  On each occasion Dr. Artis-Trower found Mr. Goodson's impairment(s) (ADHD or ADHD and PTSD) stable.  At the April 11, 2014 visit Mr. Goodson reported problems focusing and concentrating.  He was grieving the passing of several family members who recently died.  At each of his last three sessions (May 9, June 19 and July 25, 2014), Mr. Goodson reported continued benefit from the medication with no side effects.  At the last appointment Dr. Artis-Trower noted Mr. Goodson's ADHD was stable.

## *Causation*

The physician at Laurel Regional Hospital who examined Mr. Goodson the night of the motor vehicle accident diagnosed muscular spasm and headaches.  Dr. Pour, an orthopedic surgeon, examined Mr. Goodson three weeks after the accident.  He found Mr. Goodson suffered from (a) acute cervical strain/cervical radiculopathy, (b) acute upper back strain, and (c) acute low back strain/lumbar radiculopathy.  Mr. Goodson had his first session with Dr. Siekanowicz, an orthopedic surgeon, on April 26, 2012.  After obtaining a medical history and conducting a comprehensive examination, Dr. Siekanowicz diagnosed (a) post-traumatic migraines, (b) insomnia, and (c) cervical and lumbar strain and spasm with left cervical radiculitis.  Dr. Siekanowicz opined, "I feel the findings are compatible and directly attributable to the accident dated MARCH 21, 2012."

Dr. Siekanowicz referred Mr. Goodson to Dr. Kurlanzik, a neurologist, to evaluate Mr. Goodson's migraine headaches.  Mr. Goodson's initial appointment with Dr. Kurlanzik occurred on June 4, 2012, about two and a half months after the accident.  After reviewing Mr. Goodson's

history and conducting an extensive examination, Dr. Kurlanzik opined, "[a]s a result of the motor vehicle accident on March 21, 2012 this patient is having a return of migraine headaches, which he has not had in almost 20 years."

The United States has not presented any competing medical evidence.  As counsel for the United States noted during closing argument, the medical records speak for themselves.

Maryland Pattern Jury Instruction-Civil 10:1, Introductory Statement for Personal Injury and Property Damage Cases, states in pertinent part:

> The burden is on the plaintiff to prove by the preponderance of the evidence each item of damage claimed to be caused by the defendant.  In considering the items of damage, you must keep in mind that your award must adequately and fairly compensate the plaintiff, but an award should not be based on guesswork.

The undersigned finds Mr. Goodson has proven by the preponderance of the evidence that the injuries he suffered are directly attributable to the motor vehicle accident of March 21, 2012.  Mr. Goodson's symptomology is consistent with being involved in a motor vehicle accident.  His medical complaints to various medical providers are consistent.  His treating orthopedic doctor attributed Mr. Goodson's cervical and lumbar strain and spam to the motor vehicle accident.  Mr. Goodson's treating neurologist attributed Mr. Goodson's migraine headaches to the motor vehicle accident.

### *Damages*

Maryland Pattern Jury Instruction-Civil 10:2, Compensatory Damages for Bodily Injury, states in pertinent part:

> In an action for damages in a personal injury case, you shall consider the following:
>
> > (1) The personal injuries sustained and their extent and duration;

(2) The effect such injuries have on the overall physical and mental health and well-being of the plaintiff;

(3) The physical pain and mental anguish suffered in the past . . . ;

\*                         \*                         \*

(5) The medical and other expenses reasonably and necessarily incurred in the past . . .

\*                         \*                         \*

In awarding damages in this case you must itemize your verdict or award to show the amount intended for:

(1) The medical expenses incurred in the past;

\*                         \*                         \*

(5) The "Noneconomic Damages" sustained in the past . . . All damages which you find for pain, suffering . . . . inconvenience, physical impairment . . . or other nonpecuniary injury are "Noneconomic Damages";

(6) Other damages.

A.     *Physical Injuries*

The undersigned has reviewed the medical records concerning Mr. Goodson's physical injuries, *i.e.,* cervical and lumbar strain and spasm with left cervical radiculitis. These impairments developed as a result of the accident (March 21, 2012) and were resolved as of June 28, 2012 when Mr. Goodson reported marked improvement of his orthopedic complaints. Dr. Siekanowicz's examination found a full range of motion of Mr. Goodson's cervical and lumbar spine. The length of time for the soft tissue injuries to resolve, three months, is not unusual or excessive.

The undersigned finds the medical costs Mr. Goodson incurred to treat his cervical and lumbar injuries were reasonable and necessary.   The undersigned therefore **AWARDS** Mr. Goodson the following:

| PROVIDER | FROM | TO | AMOUNT |
|---|---|---|---|
| Laurel Regional Hospital | 3/21/2012 | 3/21/2012 | $193.88 |
| Contee Emergency Physicians | 3/21/2012 | 3/21/2012 | $678.00 |
| E. Masoud Pour, MD | 4/11/2012 | 4/23/2012 | $1,140.00 |
| Community Radiology Assocs. | 4/20/2012 | 5/22/2012[a] | $668.00[b] |
| Drs. Rosenthal & Siekanowicz | 4/26/2012 | 6/28/2012 | $1,130.00 |
| Laurel Regional Hospital | 4/27/2012 | 4/27/2012 | $264.05 |
| Contee Emergency Physicians | 4/27/2012 | 4/27/2012 | $624.00 |
| Accessible Physical Therapy Svs. | 4/30/2012 | 6/26/2012 | $4,030.00 |
| **TOTAL** | | | **$8,727.93** |

Additionally, the undersigned awards Mr. Goodson damages for pain and suffering at the rate of $2,500.00 per month for three (3) months or a total of **$7,500.00**.

B.    *Neurological Injuries*

The undersigned has reviewed the medical records concerning Mr. Goodson's neurological injuries, *i.e.,* migraine headaches and post-traumatic stress.   These impairments developed as a result of the accident (March 21, 2012) and were resolved as of March 7, 2014. During the March 7, 2014 office visit Mr. Goodson reported continued benefits from the medication without side effects.   Dr. Artis-Trower found Mr. Goodson's ADHD was stable, the seventh consecutive month Mr. Goodson's condition was stable.

The United States presented evidence challenging Mr. Goodson's assertion of post-traumatic stress attributable to the accident.   Notably the United States introduced into evidence

---

[a] Plaintiff's Exhibit 1, Chart with Plaintiff's Alleged Medical Bills, omitted the CT head without contrast, performed on May 22, 2012, costing $462.00.  *See* Pl.'s Ex. 4 (CRA00005 - CRA00006).
[b] Plaintiff's chart listed a total cost of $206.00, consisting of an X-ray exam of lower spine ($107.00) and X-ray exam of thorax spine ($99.00), both performed on April 20, 2012.  *See*  Pl.'s Ex. 4 (CRA00003 - CRA00004). Plaintiff omitted $462.00 incurred for CT scan of head on May 22, 2012.

Mr. Goodson's Facebook posts primarily dated March 25, 2012 (four days after the accident) and a few posts from April of 2012.  *See* Def.'s Ex. 1.  Mr. Goodson boosted about the features of his new car.

The undersigned does not find these Facebook posts persuasive in proving Mr. Goodson did not suffer from post-traumatic stress.  The undersigned finds Mr. Goodson shared the news of his car purchase and bragged about its features.  He also attempted to be funny on a couple of occasions when referring to his new car.  The United States has presented a brief snapshot of Mr. Goodson's Facebook posts without any context.

Contrarily, the undersigned finds persuasive the log Mr. Goodson maintained as directed by the psychologist at the Institute for Life Enrichment ("ILE").  At the time Mr. Goodson created this log, he could not have anticipated this log being disclosed to counsel for the United States or, for that matter, anyone outside of ILE.  Mr. Goodson was forthright in this log which reflects the post-traumatic stress he suffered.

Similarly, the undersigned finds unpersuasive Defendant's Exhibit 2, two Facebook posts from March 18, 2013 and October 18, 2013, where Mr. Goodson alludes to being drunk or to drinking.  The United States contends these posts suggest Mr. Goodson's migraines were not as severe or disabling as he claims.  According to the United States, Mr. Goodson knows or should have known the consumption of alcohol can trigger a migraine or can worsen a migraine headache.

Mr. Goodson does not deny consuming alcohol on the two occasions, the former his son's 21st birthday and the latter his own birthday.  If Mr. Goodson consumed alcohol regularly and posted regularly on Facebook about drinking, the United States would have undoubtedly presented this evidence.  Consuming alcohol on two special occasions does not mean Mr.

Goodson consumed alcohol on a regular basis nor does it suggest Mr. Goodson did not suffer migraine headaches.

Before the March 21, 2012 accident Mr. Goodson did not suffer migraine headaches for approximately 20 years.  Mr. Goodson's treating physicians had to address not only his migraine headaches but the associated emotional/mental issues which manifested themselves post-accident.  These matters took longer to resolve.

As listed on the Chart with Plaintiff's Alleged Medical Bills, Plaintiff seeks reimbursement for Dr. Artis-Trower's medical fees from August 30 to November 8, 2012. However, Mr. Goodson testified he continued to experience constant migraine headaches through June/July 2014.  Upon further review of the medical records, the undersigned finds March 7, 2014 is the date when Mr. Goodson's neurological injuries were resolved.  Mr. Goodson had reported continued benefits from the medication without any side effects.  Dr. Artis-Trower found Mr. Goodson's ADHD stable, the seventh consecutive month she found his mental condition stable.  The undersigned does not find the length of time to resolve Mr. Goodson's neurological issues excessively long.

The undersigned finds the medical costs Mr. Goodson incurred to treat his neurological injuries were reasonable and necessary.  The undersigned therefore **AWARDS** Mr. Goodson the following:

| PROVIDER | FROM | TO | AMOUNT |
|---|---|---|---|
| Institute for Life Enrichment | 5/25/2012 | 10/17/2012 | $1,400.00 |
| Maryland Orthopedic PA | 6/04/2012 | 11/19/2012 | $900.00 |
| Atlener Artis-Trower, MD | 8/30/2012 | 3/07/2014 | $5,371.00[c] |
| **TOTAL** | | | **$7,671.00** |

---
[c] Excluded from this amount is $35.00 fee for a missed appointment on December 3, 2012.

Additionally, the undersigned awards Mr. Goodson damages for pain and suffering at the rate of $1,000.00 per month for twenty-four (24) months or a total of **$24,000.00**.

<u>*Conclusion*</u>

It is hereby this <u>1st</u> day of <u>October</u>, <u>2015</u> by the United States District Court for the District of Maryland, **ORDERED**:

That judgment as to damages is entered in favor of Plaintiff Kenneth Goodson and against the Defendant United States of America in the amount of **$47,898.93**; and

That the Clerk <u>close</u> this case.


_____/s/_____
WILLIAM CONNELLY
UNITED STATES MAGISTRATE JUDGE